UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

 CRYE PRECISION LLC,

                        Plaintiff,              **MEMORANDUM & ORDER**
                                                23-CV-4469(EK)(LKE)

           -against-

 CONCEALED CARRIER, LLC d/b/a
 TACTICON ARMAMENT, a California
 Limited Liability Company,

                        Defendants.

------------------------------------x
ERIC KOMITEE, United States District Judge:

         Plaintiff Crye Precision LLC brings this copyright and

trademark infringement action against Concealed Carrier, LLC

("Tacticon").  Crye asserts that it holds copyrights in two

camouflage patterns, which it uses on various products and

markets with the trademark "MultiCam."  According to Crye,

Tacticon infringed on its copyrights and trademark by selling

counterfeit products, under the MultiCam mark, that bear a

camouflage pattern indistinguishable from Crye's design.

         Crye now moves for a preliminary injunction,

contending that post-trial damages cannot adequately compensate

for the harms Tacticon's alleged infringement will cause while

this suit is pending.  As set forth below, the motion is

granted.

## I.   Background[1]

Crye is a design and manufacturing firm that specializes in producing military and police uniforms and equipment.  Thompson Decl. ¶ 4, ECF No. 7.  At issue in this suit is its "MultiCam" design, a camouflage pattern created by Crye's founder, Caleb Crye.  To develop this pattern, Mr. Crye used Adobe Illustrator to draw (with a stylus pen) each of the pattern's more than one-hundred shapes; he arranged their "placement, specific groupings and layering"; and he selected seven specific colors for those shapes.  Crye Decl. ¶¶ 4–5, 16–18, ECF No. 6.

Crye's sister company, Lineweight LLC ("Lineweight"), owns the copyright in and to the MultiCam pattern, which it registered with the United States Copyright Office as Registration No. VA 1-942-951 (the "'951 Registration").  Thompson Decl. ¶ 7; Ex. A, Thompson Decl.  Crye, in turn, has an exclusive license to that copyright.  *Id.*; Ex. B, Thompson Decl.  Through that license, Crye sublicenses the right to print the MultiCam design onto fabrics and other materials, for the

---

[1] The factual background is taken from the record available at this stage, which includes the copyright and trademark registrations themselves, as well as declarations and evidentiary exhibits submitted by both parties. *See Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) (At the preliminary injunction stage, courts may consider evidence such as "affidavits, depositions, and sworn testimony, even when they include hearsay.").

creation of apparel and accessories such as backpacks, belts, and vests.  Thompson Decl. ¶ 7.

As part of this sublicensing, Crye requires its printers to follow certain specifications and quality-control standards in printing MultiCam products.  *Id.* ¶¶ 16-18.  Crye ensures, for example, that "nearly all" MultiCam products are "printed on fabrics in a manner" that mutes or hides the product user's "near-infrared signature"; this feature, according to Crye, conceals the user from night vision or other infrared-based optical systems.  *Id.* ¶ 17.  Crye also requires that printers apply the MultiCam design only to "high-quality, premium fabrics" with high tensile strength, so that they are resistant to tearing.  *Id.* ¶ 18.  Certain MultiCam products contain other technical features, such as fire-resistance and insecticide treatments.  *Id.*

Crye is also the owner of two federally registered trademarks (collectively, the "MultiCam Marks") that are used in connection with the advertising, marketing, and sale of MultiCam products bearing the MultiCam design.  *Id.* ¶ 8.

| Mark | Registration Number | Filing Date | Registration Date |
|---|---|---|---|
| MultiCam | 4,443,275 (the "'275 Registration") | April 12, 2013 | December 3, 2013 |
| MultiCam | 4,737,503 | January 9, 2014 | May 19, 2015 |

| | (the "'503 Registration") | | |
|---|---|---|---|

Crye has attempted to federally register eight variations of its camouflage patterns as protected trade dress.  Each time, however, the U.S. Patent & Trademark Office ("USPTO") has refused registration on the grounds that the design is "functional."  *See, e.g.*, Def. Opp'n 9, ECF No. 20; Ex. 3, U.S. Serial Nos. 86/161,357; 86/161,381; 86/161,402; 86/161,503; 86/161,550; 86/161,594; 86/161,631; 86/160,311.

Tacticon is a California corporation that markets, distributes, and sells products through e-commerce websites throughout the United States.  *See* Antone Decl. ¶ 3, ECF No. 5. Like Crye, Tacticon's offerings include camouflage products such as backpacks, belts, and vests.  *Id.* ¶¶ 3-5.

On March 23, 2023, employees at Crye became aware that Tacticon sells and markets products bearing a camouflage pattern that, Crye asserts, is "virtually identical" to the MultiCam design.  *Id.* ¶ 3; *see also* Thompson Decl. ¶ 19.  These products are identified on Tacticon's website with the color option "Multicam."  Antone Decl. ¶ 4; Thompson Decl. ¶ 19.  When it suspected infringement, Crye purchased several of Tacticon's products for inspection and analysis by its internal design team.  Thompson Decl. ¶¶ 20-24.

On June 15, 2023, Crye sued Tacticon for copyright and trademark infringement and moved for a temporary restraining order and preliminary injunction, seeking to prohibit Tacticon from infringing on its MultiCam design or MultiCam Marks.  The Court denied Crye's application for a temporary restraining order and set a briefing schedule on its motion for preliminary injunction.  The Court held argument on the motion and received supplemental briefing thereafter.  Neither party has requested an evidentiary hearing.  At the Court's invitation, Crye submitted physical exhibits — including a disassembled but otherwise unaltered rifle bag bearing the allegedly infringing camouflage pattern and a fabric cut of the MultiCam design — for the Court's inspection.

## II.  Legal Standard

A preliminary injunction is an "extraordinary" remedy. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).[2]  To obtain such an injunction, the moving party must demonstrate (1) "a likelihood of success on the merits"; (2) "a likelihood of irreparable injury in the absence of an injunction"; (3) "that the balance of hardships tips in the plaintiff's favor"; and (4) "that the public interest would not be disserved by the issuance

_____

[2] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits citations and internal quotation marks.

of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).

## III. Discussion

**A.  Crye Has Established a Substantial Likelihood of Success on the Merits**

1.  <u>Crye's Copyright Infringement Claim</u>

"To prevail on a claim of copyright infringement, the plaintiff must demonstrate both (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 108–09 (2d Cir. 2001); *see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  As set forth below, Crye has demonstrated that it is likely to succeed on the merits of its copyright infringement claim.

a.  Ownership of a Valid Copyright

Under the Copyright Act, a certificate of a registration "made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."  17 U.S.C. § 410(c).  Registrations made more than five years after first publication, however, are not without value; instead, the "evidentiary weight to be accorded the certificate" falls "within the discretion of the court."  *Id.* Where the defendant does not challenge the validity of the

certificates, or the plaintiff's ownership of the copyrights covered by the registrations, courts often extend the rebuttable presumption to these later-obtained registrations.  *See, e.g.*, *LEGO A/S v. Best-Lock Constr. Toys, Inc.*, 404 F. Supp. 3d 583, 596 (D. Conn. 2019) (collecting cases).

The MultiCam Copyrights were registered ten years after their first publication, and thus Crye is not entitled to the statutory presumption of validity.  Because Tacticon does not appear to challenge the validity of the registration certificates themselves, or Crye's ownership over the copyrights they cover, the Court will accord them "some evidentiary weight" in its assessment of Crye's copyrights.  *See Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 154 n.5 (2d Cir. 2007).

i.   Originality

"To qualify for copyright protection, a work must be original — that is, it must be independently created by the author and possess 'at least some minimal degree of creativity.'"  *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir. 2012) (quoting *Feist,* 499 U.S. at 345).  This "requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be."  *Feist,* 499 U.S. at 345; *see Mattel, Inc. v. Goldberger Doll Mfg.*

*Co.*, 365 F.3d 133, 135 (2d Cir. 2004).  At the same time, "copyright protection extends only to a particular expression of an idea, and not to the idea itself."  *Boisson v. Banian, Ltd*, 273 F.3d 262, 268 (2d Cir. 2001).

Crye has demonstrated that its MultiCam designs were the result of "artistic decisionmaking" and thus original.  *See Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 764-65 (2d Cir. 1991).  Caleb Crye attests to the process by which he created MultiCam — hand-drawing more than a hundred unique shapes and then selecting, grouping, and layering them in a specific arrangement.  Crye Decl. ¶¶ 4-5.  Crye combined seven distinct colors in different layers to create the final pattern.  *Id.* ¶¶ 16-17.  The selection, contours, arrangement, and colors of the various shapes all involved aesthetic choices.  *See id.* ¶ 18.  The resulting MultiCam design is thus sufficiently original to merit copyright protection.  *See, e.g.*, *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1005 (2d Cir. 1995) (copyright in leaf and squirrel design on children's sweater); *MPD Accessories B.V. v. Urb. Outfitters*, No. 12-CV-6501, 2014 WL 2440683, at *6 (S.D.N.Y. May 30, 2014) (copyright in scarf design with "stripes of different widths and lengths, in different directions, in different colors and with irregular spacing").

Tacticon does not deny that some aesthetic choices went into developing the MultiCam pattern, but asserts that any such copyright in the design is nevertheless inherently "thin." Def. Opp'n 6. Works that "contain a larger share of non-copyrightable elements" generally enjoy "thinner" copyright protection. *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 53 (2d Cir. 2021), *aff'd sub nom. Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) (collecting cases). Thin copyright protection is "appropriate where works reflect scant creativity," such as when the "work is composed of elements in the public domain" or "the author has chosen to express an idea without much embellishment, so that the expression is nearly indistinguishable from the idea itself." *Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 210 F. Supp. 2d 147, 163 (E.D.N.Y. 2002), *aff'd sub nom. Well-Made Toy Mfg. Corp v. Goffa Int'l Corp.*, 354 F.3d 112 (2d Cir. 2003); *see Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 135–36 & n.11 (2d Cir. 2003).[3]

Tacticon's best case on this point is *Beaudin v. Ben & Jerry's Homemade, Inc.*, 95 F.3d 1, 2 (2d Cir. 1996), in which

---

[3] Although not cited in Tacticon's opposition, defense counsel raised at oral argument the doctrine of merger, which is "separate" from the concept of thinness but "related" to it. *Well-Made Toy Mfg. Corp.*, 210 F. Supp. 2d at 163. Under this doctrine, "if there is just one way to express an idea, the idea and expression are said to merge, and the expression is not protectible." *Yurman Design,* 262 F.3d at 111.

the Second Circuit affirmed the holding that Ben & Jerry's "cow hats" did not infringe on the plaintiff's "caps with Holstein cow patterns." The court held that the plaintiff's "Holstein-like black splotches on a white background" were entitled only to thin protection because the "quantum of originality" in Beaudin's splotch pattern was only "slight." *Id.*

But *Beaudin* does not control here. On the instant record, Crye has shown that the MultiCam pattern is the product of more than "scant creativity." The arrangement of colors and shapes in the MultiCam pattern permits substantially more variation than the "black splotches on a white background" at issue in *Beaudin.* As the Second Circuit pointed out in *Beaudin*, the nature of cow spots that anyone else painting them would run the risk of creating a design "indistinguishable" from the plaintiff's "original" version. *Beaudin*, 95 F.3d at 2.[4]

By contrast, one could envision hundreds, if not thousands, of ways to express the idea of camouflage suitable for multiple environments, with variations in the selection, rendering, arrangement, and coordination of the individual shapes and colors. Even further refining the "idea" to multi-environment camouflage suitable for particular terrains like

---

[4] Even then, the Second Circuit noted that Ben & Jerry's cow pattern differed from Beaudin's. *See id.* ("The white background is a minimal feature of Beaudin's hat, but is an extensive feature of the Ben & Jerry's versions of the Holstein splotch pattern."). Here, in contrast, the defendant's camouflage pattern is virtually identical to the plaintiff's.

those in Afghanistan — thus limiting the color choices available
to those corresponding to that geography — still yields numerous
possible "expressions."  The Court need not guess at what some
of these different variations might look like: Crye provides a
sampling of camouflage patterns that use the same general color
choices (browns, tans, creams, and greens) and yet appear highly
dissimilar.  Crye Decl. ¶ 19 (visually excerpting the
HyperStealth Thortex and Survival Corps SURPAT camouflage
patterns); Ex. D, Crye Decl. (visually excerpting numerous
multi-environment camouflage patterns that post-dated MultiCam's
creation).

Crye has therefore demonstrated, at this stage, that
the MultiCam is sufficiently creative to be entitled to
copyright protection.

ii.  Separability

More fundamentally, Tacticon argues that the MultiCam
pattern has a utilitarian function and therefore is ineligible
for copyright protection.  Def. Opp'n 7.  Because camouflage's
function is to disguise the wearer's location by blending into
the background, they say, MultiCam is an unprotectable "useful
article."  *Id.* at 7-9.  Tacticon fails, however, to satisfy the
test set out in *Star Athletica, L.L.C. v. Varsity Brands*, 580
U.S. 405, 414-24 (2017) — under which the MultiCam pattern, at
this stage, passes muster.

11

The Copyright Act applies to "original works of authorship fixed in any tangible medium of expression" including "pictorial, graphic and sculptural works."  17 U.S.C. § 102. Copyright protection extends to the "design of a useful article," however, only if those features "can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article."  *Id.* §§ 101, 102(a).  A "useful article," in turn, is one "having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information."  *Id.* § 101.

In *Star Athletica*, the Supreme Court clarified that "a feature of the design of a useful article is eligible for copyright if, when identified and imagined apart from the useful article, it would qualify as a pictorial, graphic, or sculptural work either on its own or when fixed in some other tangible medium."  580 U.S. at 417.  Broken down, this "separability" analysis has two requirements: "separate identification" and "independent existence."  *Id.* at 414.  Under the first requirement, which "is not onerous," one "need only be able to look at the useful article and spot some two- or three-dimensional element that appears to have pictorial, graphic, or sculptural qualities."  *Id.*  Under the second, the "decisionmaker must determine that the separately identified feature has the capacity to exist apart from the utilitarian

aspects of the article." *Id.* "In other words, the feature must be able to exist as its own pictorial, graphic, or sculptural work as defined in § 101 once it is imagined apart from the useful article." *Id.*

Applying that test to the cheerleading uniforms at issue, the Supreme Court concluded that the uniform decorations were separable and therefore entitled to copyright protection. *Id.* at 417-18. Specifically, the "colors, shapes, stripes, and chevrons" on the uniform's surface could be identified as "features having pictorial, graphic, or sculptural qualities." *Id.* at 417. And once "separated from the uniform and applied in another medium," these features "would qualify as two-dimensional works of art." *Id.*

Crye's MultiCam pattern likewise satisfies this test. At the first step, the Court can "spot" the two-dimensional element[s] — the distinctive shapes and colors that compose the MultiCam design — that have "pictorial" or "graphic" qualities. *Id.* At the second step, the MultiCam design is "capable of existing" as a work once "imagined apart from the useful article." *Id.* at 414, 417. If imaginatively removed from tactical gear and applied — "for example, on a painter's canvas," — the pattern could still qualify as a two-dimensional work of art. *Id.* at 417. Crye indicates that the Court need not imagine such situations, as the MultiCam design has actually

13

been applied in this artistic, non-useful manner — appearing on a NASCAR car, on professional sports team jerseys, and as a piece of artwork featured in the Museum of Modern Art.  ECF No. 7 ¶¶ 14-15; *see Star Athletica*, 580 U.S. at 417 ("Indeed, respondents have applied the designs in this case to other media of expression — different types of clothing — without replicating the uniform.").

Forgoing this separability analysis, Tacticon instead focuses on the MultiCam design's original function — concealing the wearer of apparel in which it appeared — and its effectiveness in performing that function.  Def. Opp'n 7–9. *Star Athletica*, however, forecloses this argument.  *Star Athletica*, 580 U.S. at 421.  As the Supreme Court clarified, the Copyright Act explicitly protects "applied art," which is defined to include "those arts or crafts that have a *primarily utilitarian function,* or . . . the designs and decorations used in these arts."  *Id.* (quoting Random House Dictionary 73 (1966)).  "An artistic feature that would be eligible for copyright protection on its own cannot lose that protection simply because it was first created as a feature of the design of a useful article, even if it makes that article more useful." *Id.*  In this way, copyright law does not recognize "any 'distinctions between purely aesthetic articles and useful works of art.'"  *Id.* (quoting *Mazer v. Stein*, 347 U.S. 201, 211

14

(1954)).  Such is the case here: the fact that the MultiCam design, as camouflage, has some functional qualities does not render it ineligible for copyright protection.

For these reasons, Crye has shown a likelihood of success in establishing a valid copyright in the MultiCam design.

b.   Infringement of the Copyright

To satisfy the second element of a copyright infringement claim, a plaintiff "must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999).

Actual copying may be established "either by direct evidence of copying or by indirect evidence." *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir. 1992).[5]  Indirect evidence "includes proof that the defendants had access to the copyrighted work and similarities that are probative of copying

---

[5] "[D]irect evidence of copying is seldom available," *Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995), but could include an admission that the copyrighted material served as the source of a given work.  *Recycled Paper Prod., Inc. v. Pat Fashions Indus., Inc.*, 731 F. Supp. 624, 626 n.2 (S.D.N.Y. 1990).  Here, Crye argues that the copying element is met because Tacticon's products are "virtually identical to MultiCam." Crye Mem. 13.  Though Crye does not specify whether this is offered as direct or indirect proof, it fits most neatly into the "similarity" prong of indirect proof.

between the works." *Hamil*, 193 F.3d at 99.  Proof of access, in turn, "may be established directly or inferred from the fact that a work was widely disseminated or that a party had a reasonable possibility of viewing the prior work." *Boisson*, 273 F.3d at 270.  An "inverse relationship between access and probative similarity" exists "such that the stronger the proof of similarity, the less the proof of access is required." *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 56 (2d Cir. 2003). And where "the two works are so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access." *Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995).

Two works are substantially similar when "an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010).  "In applying the so-called 'ordinary observer test,'" courts ask "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Id.*  "[I]n the end, [the] inquiry necessarily focuses on whether the alleged infringer has misappropriated "the original way in which the author has selected, coordinated, and arranged' the elements of his or her work." *Id.*

Crye has sufficiently demonstrated that it is likely to prove substantial similarity.  Here, access can be inferred because, as Crye attests and Tacticon does not dispute, the Multicam design is "widely disseminated," and there exists a "reasonably possibility" that Tacticon — which produces competing products — had previously seen the pattern.  *See Boisson*, 273 F.3d at 270.  A visual comparison of the MultiCam pattern and Tacticon's design, moreover, suggests that the two works are substantially similar in the selection and coordination of the unique shapes, and the general coloring of those shapes.

As discussed above, the MultiCam design contains over a hundred unique hand-drawn shapes, which Mr. Crye placed, grouped, and layered in a distinctive arrangement.  An inspection of Tacticon's design reveals shapes virtually identical to those in the MultiCam design, in a near-identical arrangement.  Crye's supporting papers assist in this visual comparison, by including a "shape by shape and cluster by cluster" comparison of the Tacticon and MultiCam designs.  Thompson Decl. ¶ 20.  Specifically, Crye's design team aligned the two camouflage patterns and then broke them down into forty-eight separate portions, enlarging and placing the resulting cutouts next to one another.  Ex. E, Thompson Decl.  The results of this analysis are striking, with the shapes and clusters

appearing in the Tacticon pattern nearly indistinguishable from those found in the MultiCam design.  Crye provides evidence of copying in another way, by lining up or overlaying the two patterns: when superimposed on top of MultiCam's pattern, the Tacticon design continues the shapes and arrangement of the underlying pattern in a near-seamless manner.  In other words, both the contours of shapes and "the structural layout of these [shapes] is essentially the same in both designs." *Tufenkian Imp./Exp. Ventures*, 338 F.3d at 136.  Given these striking similarities, an "ordinary observer" would likely recognize Tacticon's design "as having been appropriated from" the MultiCam pattern.  *Knitwaves,* 71 F.3d at 1001.

Tacticon points out, and Crye's own director concedes, that there are some "slight differences in the shades of color" and "minimal modifications to some of the shapes."  Def. Opp'n 5 (quoting Thompson Decl. ¶ 26).  These negligible variations between the two products, however, "pale in comparison to the overwhelming impression of similarity." *Knitwaves*, 71 F.3d at 1005.

For these reasons, Crye has demonstrated a substantial likelihood of success on its copyright infringement claim.

2.   Crye's Trademark Infringement Claims

Crye also asserts that Tacticon infringed its "MultiCam" mark.  To prevail on a trademark infringement claim,

a plaintiff must demonstrate that "(1) it has a valid mark that is entitled to protection and that (2) the defendant's actions are likely to cause confusion with that mark." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020).  Here, too, Crye has demonstrated that it is likely to succeed on the merits of its trademark claims.

      a.   Validity of Trademarks

Federal registration of a trademark is "prima facie evidence of the validity of the registered mark," as well as the registrant's ownership and exclusive right to use the mark.  15 U.S.C. §§ 1057(b); 15 U.S.C. § 1115(a); *Matal v. Tam*, 582 U.S. 218, 226–27 (2017).  The presumption of validity means that "the trademark is considered to be, at a minimum, descriptive with secondary meaning." *See, e.g.*, *CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 151 (E.D.N.Y. 2011) (collecting cases); *see Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 393 n.6 (2d Cir. 1995) ("[I]t [is] clear that a decision by the USPTO to register a mark without proof of secondary meaning "affords a rebuttable presumption that the mark is more than merely descriptive.").  When a plaintiff sues for infringement of a trademark that is registered, the burden shifts to the defendant to rebut the mark's protectability. *See Lane Capital Mgmt., Inc. v. Lane Capital Mgmt.*, Inc., 192 F.3d 337, 345 (2d Cir. 1999).

In addition, a "registered mark becomes incontestable if it has been in continuous use for five consecutive years subsequent to its registration and is still in use." *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993); 15 U.S.C. § 1065.  Incontestable trademarks are "conclusive evidence" of the mark's validity. 15 U.S.C. § 1115(b); *see KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,* 543 U.S. 111, 117 (2004).

In this case, it is undisputed that Crye owns two federally registered trademarks in the word "MultiCam" — the '275 and '503 Registrations — which are used in connection with the advertising, marketing, and sale of products bearing the MultiCam pattern.  Thompson Decl. ¶ 8.  Because, moreover, it has been in continuous use for five years after its registration, the MultiCam Mark has become incontestable.  Thus, Crye is entitled to "enjoin its infringement relying on the mark's incontestability against a defense that the mark is merely descriptive." *Gruner*, 991 F.2d at 1077.

Tacticon contends that the MultiCam Marks are not incontestable because Crye obtained their registrations by fraud, and the term MultiCam is generic.  As explained below, for purposes of this motion, Tacticon is unlikely to carry its burden to demonstrate that the MultiCam Marks are invalid.

20

i.   Fraud in Obtaining the Trademark

Tacticon first asserts that the MultiCam Marks are not incontestable (and in fact, are invalid) because Crye made fraudulent statements to the USPTO to obtain the '503 Registration.  Def. Opp'n 9-10.  Such a defect, if proven, would vitiate the incontestable nature of that mark, *see* 15 U.S.C. § 1115(b) — but only that mark.  Tacticon does not challenge the '275 Registration on fraud grounds.

A party asserting registration fraud bears a "heavy burden," *Quality Serv. Grp. v. LJMJR Corp.*, 831 F. Supp. 2d 705, 710 (S.D.N.Y. 2011) — one that it must meet by "clear and convincing evidence."  *See Orient Exp. Trading Co. v. Federated Dept. Stores, Inc.*, 842 F.2d 650, 653 (2d Cir. 1988).  "Fraud in procuring a trademark registration occurs when an applicant knowingly makes false, material representations of fact in connection with his application."  *MPC Franchise, LLC v. Tarntino*, 826 F.3d 653, 658 (2d Cir. 2016).  A party must demonstrate that the registrant made a "deliberate attempt to mislead the PTO"; "mere error or inadvertence" is not enough. *Orient Exp. Trading Co.*, 842 F.2d at 653; *see Quality Serv. Grp.*, 831 F. Supp. 2d at 710.  The "knowing misstatement," moreover, must be material — "one that would have affected the PTO's action on the applications."  *Orient Exp. Trading Co.*, 842 F.2d at 653.  The party "alleged to have committed fraud," in

21

turn, "may rely on good faith as a defense." *Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96, 107 (E.D.N.Y. 2012) ("Fraud will not lie if it can be proven that the statement, though false, was made with a reasonable and honest belief that it was true.").

Tacticon asserts that Crye's parent company, Lineweight LLC, misled the USPTO by representing that the term "Multicam" "appearing in the mark has no significance nor is it a term of art in the relevant trade or industry or as applied to the goods/services listed in the application, or any geographical significance." Def. Opp'm 10 (quoting Ex. 4 at 11), ECF No. 20-5. This statement was false, according to Tacticon, because "MultiCam" is "short for the descriptive phrase 'multi-environment camouflage'" and therefore clearly "has significance to the [camouflage] goods described in the application." Def. Opp'n 10. But Tacticon has not proffered meaningful evidence that the word was in fact functioning as a "term of art" in the industry when Crye made the statement in question.

And the statement appears to be technically accurate, as Crye asserts: "MultiCam" is a made-up word that had no meaning in the industry and was not used to describe the goods identified in the '503 Registration, including objects such as helmets, sunglasses, belts, bags, clothing, and others. *See*

22

Crye Reply 6, ECF No. 22.  Crye also raises a good-faith
defense.  *Id.*  It points out that the USPTO had previously
approved the '275 Registration, which was issued for "printed
camouflage patterns for use on fabrics and hard surfaces,"
without asking for the same information requested with respect
to the '503 Registration.  *Id.*  Because the earlier application
did not include this information and was not rejected as
deceptive, Crye argues that it could reasonably have believed
that the information was not material or misleading in the later
application.  *Id.*  The history of the '275 mark's prosecution,
Crye asserts, suggests that Crye's counsel did not make
knowingly false statements to mislead the USPTO to approve the
'503 Registration.

In light of the "heavy burden" that rests on the party
asserting fraud, and the very limited record put forward by
Tacticon, which bears the burden on this issue, Tacticon's
challenge to the MultiCam Marks' incontestability on this ground
does not prevail.

ii.  Genericide

Even if it was not a recognized "term of art" when
registered, Tacticon asserts that "MultiCam" has become a
generic term and thus lost its incontestable status.  Def. Opp'n
13-17.  "A trademark or service mark that becomes generic is no
longer entitled to protection."  *Pilates, Inc. v. Current*

*Concepts, Inc.*, 120 F. Supp. 2d 286, 296 (S.D.N.Y. 2000) (citing *Park 'n Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985)). Thus, even an incontestable mark can be rendered invalid if it has become "the generic name for the goods or services, or a portion thereof, for which it is registered." 15 U.S.C. § 1064(3); *see, e.g.*, *Tiffany & Co. v. Costco Wholesale Corp.*, 994 F. Supp. 2d 474, 481 (S.D.N.Y. 2014), *aff'd* 971 F.3d 74 (2d Cir. 2020).

"Marks that constitute a common descriptive name are referred to as generic. A generic term is one that refers to the genus of which the particular product is a species." *Park 'n Fly*, 469 U.S. at 194; *see RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 120 (2d Cir. 2022) ("A generic mark is a common name, such as automobile or aspirin, that identifies a kind of product."). As relevant here, a term is "the victim of 'genericide'" where "a seller establishes trademark rights in a term which a majority of the relevant public then appropriates as the name of a product." *Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208, 213–14 (S.D.N.Y. 2001) (collecting, as notable examples of genericized terms, aspirin, cellophane, escalator, and thermos). Whether a term has become generic is a fact-intensive inquiry, and courts typically consider, among other evidence, "(1) dictionary definitions; (2) generic use of the term by competitors and other persons in the trade; (3)

plaintiff's own generic use; (4) generic use in the media; and (5) consumer surveys." *Pilates, Inc.*, 120 F. Supp. 2d at 297.

According to Tacticon, the term "multicam" has become a generic term for "camouflage used in multiple environments" and therefore cannot function as a trademark. Def. Opp'n 13. In support of this argument, Tacticon marshals a small sample of eleven third-party online retailers that use the term "multicam" in selling camouflage gear. Def. Opp'n, Ex. 5, ECF No. 20-6. Crye's response is dispositive: it upends this argument by pointing out that all but four of these retailers are actually licensed distributors or sellers of MultiCam productors. Antone Reply Decl., ¶ 4, ECF No. 23. Tacticon also points to Crye's own use of the word "MultiCam" in its briefing as a noun, rather than an adjective. Def. Opp'n 16–17. Tacticon argues that this use of the word, without modification, is evidence that Crye uses the term generically itself. *Id.* Such a showing is plainly insufficient, for purposes of this motion, to demonstrate that a majority of the relevant public use "MultiCam" as a common name to identify camouflage for multiple environments.

Therefore, as with its assertion of registration fraud, based on the limited record at this stage, Tacticon has not met its burden to overcome the validity of the MultiCam Marks.

b.   Likelihood of Consumer Confusion

To satisfy the second element of a trademark infringement claim, the plaintiff must demonstrate that "the defendant's use of a similar mark is likely to cause consumer confusion." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 129 (2d Cir. 2004).  This "prong turns on whether ordinary consumers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of [the junior user's] mark." *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016).

To evaluate the likelihood of consumer confusion, the Second Circuit uses the eight-factor test set out by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961).  These factors examine: (1) the strength of the plaintiff's mark; (2) the similarity of the marks; (3) the competitive proximity of the products in the marketplace; (4) the likelihood that the senior user will "bridge the gap" by moving into the junior user's product market; (5) evidence of actual confusion; (6) the junior user's intent – good or bad faith – in adopting the mark; (7) the respective quality of the products; and (8) the sophistication of the consumers in the relevant market.  *Id.* at 495.  "No single factor is dispositive; rather, each is evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of

the product." *Souza v. Exotic Island Enterprises, Inc.*, 68 F.4th 99, 110 (2d Cir. 2023).

      i.    Strength of the Mark

     "The strength of a mark refers to its distinctiveness, that is to say, the mark's ability to identify goods sold under it as coming from one particular source." *Streetwise Maps., Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998).  Courts evaluate distinctiveness based on either or both of the following: (1) "the degree to which it is inherently distinctive," often referred to as conceptual strength; and (2) "the degree to which it has achieved public recognition in the marketplace," often referred to as acquired or commercial strength.  *RiseandShine*, 41 F.4th at 120.

     First, conceptual strength "is assessed on a continuum from least to most distinctive, with the aid of categories usually called (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful, with marks in the last category considered the strongest." *Car-Freshner Corp. v. Am. Covers, Inc.*, 980 F.3d 314, 329 (2d Cir. 2020).  As most relevant here, a descriptive mark "is one that tells something about a product, its qualities, ingredients or characteristics," while a suggestive mark "suggest[s] (rather than directly describe[s]) the product on which [it is] employed, or its attributes, sometimes requiring imagination to grasp the linkage." *Gruner,*

991 F.2d at 1076.  Descriptive marks are "presumptively unprotectable," but can become protectable "if they have acquired secondary meaning, *i.e.* an acquired public recognition as a mark identifying the source." *RiseandShine*, 41 F.4th at 121.  Suggestive marks, by contrast, "are protectable without need to show acquired secondary meaning." *Id.*

Crye's MultiCam Marks are suggestive.  They do not immediately describe the nature of Crye's products — camouflage suitable for multiple environments — but instead require the consumer to make at least some "additional mental effort to identify the associated product in particular." *Cross Com. Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 163 (2d Cir. 2016); *see, e.g.*, *DJ Direct, Inc. v. Margaliot*, 512 F. Supp. 3d 396, 409-10 (E.D.N.Y. 2021) ("KaraoKing," a "portmanteau of the words 'Karaoke' and 'King, [was] meant to suggest a superior karaoke machine"); *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 188, 240 (S.D.N.Y 2022) (categorizing "JACKPOCKET," formed by "the juxtaposition of 'jackpot' and 'pocket,'" as suggestive of internet lottery products).  Nor does the "MultiCam" Mark "conjure up the image of the precise good with which it is associated," as does a descriptive mark.  *Playtex Prods., Inc. v. Ga.-Pac. Corp.*, 390 F.3d 158, 164 (2d Cir. 2004) (affirming finding that mark "Wet Ones," used for moist towelettes, was suggestive).

28

Second, a mark is commercially strong if it has acquired "secondary meaning," such that "in the minds of the public, the primary significance of" the mark "is to identify the source of the product rather than the product itself." *Christian Louboutin, S.A., v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206, 216 (2d Cir. 2012). Here, the MultiCam Marks are incontestable, and therefore have acquired secondary meaning as a matter of law. *See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 391 (2d Cir. 2002) ("Because FSLC continually maintained its registration of the mark, FSLC's mark is incontestable and, as a matter of law, it has acquired secondary meaning"); *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 194 (S.D.N.Y. 2020) (similar).

The strength of the MultiCam Marks therefore weighs in favor of Crye.

### ii.  Similarity of the Marks

"In assessing the similarity between two marks, a court will look to whether the similarity is likely to cause consumer confusion." *Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*, 182 F.3d 133, 139–40 (2d Cir. 1999). Because Tacticon has reproduced the "MultiCam" Marks in their entirety, this factor weighs in favor of Crye. *See, e.g., Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996) ("For the purpose of considering the question of the similarity

of the marks, the district court correctly determined that as a matter of law these marks ["COTT" v. "COTT"] are identical"); *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 500 (S.D.N.Y. 2013) ("Defendants' marks, JUICY GIRL, JUICYLICIOUS and JG are similar, if not identical (i.e., Juicy Girl), to the Juicy Marks in name alone.").

        iii. Competitive Proximity

        "The 'proximity-of-the-products' inquiry concerns whether and to what extent the two products compete with each other." *Cadbury Beverages*, 73 F.3d at 480 (2d Cir. 1996). "To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." *Lang v. Ret. Living Pub. Co., Inc.*, 949 F.2d 576, 582 (2d Cir. 1991). "In examining this factor[,] a court should compare all aspects of the products, including price, style, intended uses, target clientele, typical distribution channels, and others." *Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281, 296 (S.D.N.Y. 2003).

        This factor weighs in favor of Crye. Even on this limited record, *cf.* Def. Opp'n 19, it is apparent that Tacticon sells the same or similar apparel and products — including backpacks, rifle bags, belts, and vests — as those that bear the MultiCam Marks. Tacticon markets and distributes such products

through some of the same channels of trade as Crye's authorized distributors, including on e-commerce platforms like the Amazon marketplace.  *See* Def. Opp'n, Ex. 5.  And Tacticon and Crye's authorized distributors market and sell their products to a similar target audience, which includes both the civilian public and members of the military and law enforcement.  Compl. ¶ 44; Antone Reply Decl., ¶¶ 5-6.  As to the former group of consumers, in its exhibit listing examples of retailers that use the term "MultiCam," Tacticon identified several of Crye's licensees that sell to the civilian public, as does Tacticon. Def. Opp'n, Ex. 5.  These licensees also sell in the same internet distribution channels as Tacticon.  *Id.*  And as for military target consumers, Tacticon's own Amazon storefront page describes its gear as "combat ready," suggesting, at the very least, that it is not intended only for commercial use.  *See id.*

This overlap in product offering, intended uses, target consumers, and distribution channels indicates that the two products share competitive proximity with each other.

iv.  Likelihood that Crye Will Bridge the Gap

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so."  *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005).  This factor, too, straightforwardly favors Crye:

because Tacticon's products and those of Crye's licensees are in competitive proximity, "there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis in this case." *Id.*

> v.   Evidence of Actual Confusion

"For purposes of the Lanham Act, actual confusion means consumer confusion that enables a seller to pass off his goods as the goods of another." *Sports Auth. Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 963 (2d Cir. 1996).  Evidence of consumer confusion may include "mistaken orders, complaints from customers or website visitors, market surveys or other signs of uncertainty reflecting actual consumer confusion." *Big Star Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 213 (S.D.N.Y. 2000).  At the same time, "[i]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a *likelihood* of confusion as to source." *Guthrie Healthcare Sys.*, 826 F.3d at 45 (emphasis added).

This factor weighs slightly in favor of Crye, even though it has presented no evidence actual consumer confusion. Because the use of an identical mark is "inherently confusing, consumer confusion is presumed." *See, e.g.*, *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 241 (S.D.N.Y. 2013);

*Colgate-Palmolive Co. v. J.M.D. All-Star Imp. & Exp. Inc.*, 486 F. Supp. 2d 286, 289 (S.D.N.Y. 2007).  This confusion is, of course, even more likely when the parties compete in the same markets.

### vi.  Good or Bad Faith

"In analyzing whether a defendant has acted in bad faith, the question is whether the defendant attempted 'to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products.'" *Tiffany & Co.*, 971 F.3d at 88.  This factor "does not bear directly on whether consumers are likely to be confused," although it may "affect the court's choice of remedy" or "tip the balance where questions are close." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003).

Based on the current record, the Court declines to infer that Tacticon was acting in bad faith, and treats this factor as neutral.

### vii. Respective Quality of Products

"This factor generally considers whether the senior user's reputation could be tarnished by the inferior merchandise of the junior user." *Cadbury Beverages, Inc*, 73 F.3d at 483. As with the existence of bad faith, this factor is not "of high relevance" to the likelihood-of-confusion inquiry, "as it goes more to the harm that confusion can cause the plaintiff's mark

and reputation." *Virgin Enterprises*, 335 F.3d at 152.  Quality
may become relevant, however, "when there is an allegation that
a low quality product is taking unfair advantage of the public
good will earned by a well-established high quality product."
*Gruner*, 991 F.2d at 1079.

As evidence of the respective quality of the products,
Crye submits a few negative customer reviews submitted on
Tacticon's Amazon storefront, which describe the products as
flimsy and "cheaply made."  Antone Decl. ¶ 5.  Such reviews,
however, do "little, if anything, to bespeak the quality of the
underlying product": as one court observed, "it is a rare
product that does not attract at least a small handful of
negative product reviews."  *Ill. Tool Works Inc. v. J-B Weld
Co., LLC*, 419 F. Supp. 3d 382, 399 (D. Conn. 2019).  Indeed, in
asserting that it offers high-quality products, Tacticon points
to broader indicators of customer satisfaction on the Amazon
storefront — namely, a 94% positive ranking in the last twelve
months, based on almost 2,500 reviews, and an overwhelming
balance of "4-5 star" reviews on individual products.  Def.
Opp'n 20.

More persuasive is Crye's argument that products
distributed under its MultiCam Mark are subject to certain
quality specifications.  Thompson Decl. ¶¶ 16-18.  Products
bearing the MultiCam Mark must include near-infrared concealment

features; depending on the product, they must also be tear-, fire-, and/or insect-resistant.  *Id.*  Tacticon does not dispute that its product offerings lack some or all of these features. This difference in quality could reasonably diminish consumer perceptions of MultiCam Mark-bearing products.  This factor therefore weighs in favor of Crye.

viii. Sophistication of the Consumers

"The final *Polaroid* factor is grounded on the belief that unsophisticated consumers aggravate the likelihood of confusion."  *Juicy Couture*, 930 F. Supp. 2d at 502.  This analysis focuses on the "general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods."  *Sports Auth.*, 89 F.3d at 965. Generally, "the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in . . . trademarks will result in confusion concerning the source or sponsorship of the product."  *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992).  The "nature of the product or its price" often impact the care a consumer will take in making purchases.  *Rush Indus., Inc. v. Garnier LLC*, 496 F. Supp. 2d 220, 229 (E.D.N.Y. 2007), *aff'd*, 309 F. App'x 431 (2d Cir. 2009).

This factor slightly favors Tacticon, or is at best neutral. On the one hand, as Tacticon points out, Crye markets its goods, in large part, to a class of sophisticated and careful consumers who are unlikely to be confused: members of the military and law enforcement units whose lives might depend on the purchased products. Def. Opp'n 21-22; *see Med. Econ. Co. v. Prescribing Reference, Inc.*, 294 F. Supp. 2d 456, 465 (S.D.N.Y. 2003) (finding medical professionals to be "highly sophisticated and unlikely to be confused" in discerning monthly periodicals dealing with prescription drugs).

At the same time, both parties' products are marketed to the civilian public, including through widely disseminated online channels, and "[r]etail customers . . . are not expected to exercise the same degree of care as professional buyers." *Virgin Enterprises*, 335 F.3d at 151. And where, as here, the products look to be identical and the marks are identical, the sophistication of buyers cannot necessarily be relied on to prevent confusion. *See Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 492 (2d Cir. 1988).

Given the limited record available at this time, this factor is at best neutral, or weighs slightly in favor of Tacticon.

\*     \*     \*

After considering each of the eight *Polaroid* factors — the overwhelming balance of which weigh in favor of Crye — the Court finds that Crye has established a likelihood of success that Tacticon's use of the MultiCam Marks are likely to cause consumers confusion as to the source of its products.

## B.   Crye is Likely to Suffer Irreparable Harm Absent an Injunction

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  Irreparable harm is "a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (per curiam).  Where, by contrast, "there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005).  "The standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already have occurred," *see Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) — although such threat must be "actual and imminent," not "remote" or speculative." *Faiveley Transp. Malmo AB*, 559 F.3d at 118.

Crye has demonstrated that it is likely to suffer irreparable harm absent injunctive relief enjoining Tacticon's use of its MultiCam Mark.  Following the enactment of the Trademark Modernization Act of 2020, a plaintiff seeking a preliminary injunction is "entitled to a rebuttable presumption of irreparable harm" once it establishes a likelihood of success on the merits.  15 U.S.C. § 1116(a).  In other words, if the plaintiff demonstrates both the validity of its mark and a likelihood of confusion, and the defendant fails to rebut the presumption, the plaintiff satisfies its burden of showing irreparable harm.  Tacticon does not meaningfully attempt to rebut this presumption; its argument that there is no harm because there is no infringement fails, given the conclusions above.

In the copyright context, unlike trademark, "courts must not simply presume irreparable harm." *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010).  "Rather, plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm." *Id.*  Harm may be irreparable where the infringement "would substantially diminish the value" of the work, "the loss is difficult to replace or measure," or "plaintiffs should not be expected to suffer the loss." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012).

Crye has demonstrated that it will suffer irreparable harm absent injunctive relief in the form of confusion in the marketplace, as well as the loss of goodwill and reputation.  As Crye asserts, and Tacticon does not meaningfully dispute, the company has invested substantial time, money, and resources — to the tune of "decades of effort and hundreds of thousands of dollars annually" — to develop the MultiCam design and to build goodwill among its customers.  Thompson Decl. ¶¶ 29-30.  Crye maintains its reputation for its high-quality products, in part, by implementing and enforcing quality-control standards and fabric specifications for its licensees.  *Id.* ¶ 30.

Tacticon, by contrast, markets and sells products with a camouflage pattern virtually identical to the MultiCam design, but on fabrics and materials that undisputedly lack the specifications required by Crye.  In other words, although Tacticon's products look like MultiCam-designed products, they do not perform in the same ways — a distinction that may not be readily apparent to consumers.  For these reasons, Tacticon's products threaten to cause "confusion among customers and loss of goodwill for plaintiffs."  *CJ Prod.*, 809 F. Supp. 2d at 145; *Pearson Educ., Inc. v. Labos*, No. 19-CV-487, 2019 WL 1949820, at *6 (S.D.N.Y. Apr. 23, 2019) (finding, in trademark and copyright case, irreparable harm to [plaintiff's] brand, business reputation, and goodwill, because customers seeking to purchase

authentic [textbooks] will often be misled into purchasing inferior, counterfeit copies").  This likelihood of confusion is especially true because the "similarity in the design of the" two camouflage patterns is "coupled with" Tacticon's use of the "MultiCam" Mark in advertising its products.  *Id.*

Tacticon asserts, in response, that these harms of which Crye complains in support of its copyright infringement claims are only cognizable in the trademark infringement context.  Def. Suppl. Br. 1–2, ECF No. 31.  According to Tacticon, market confusion and any resulting reputational harms to Crye are, by nature, predicated on consumers associating the MultiCam design with Crye (and thus presumably thinking less of Crye because of Tacticon's products).  *See id.*  In this way, MultiCam functions as a "source-identifier" — a hallmark of trademark protection.  *See EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 64 (2d Cir. 2000) ("[Trademark's] function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his.").  And because USPTO has refused to grant Crye trademark or trade dress rights in the MultiCam design, Tacticon asserts, Crye cannot assert these trademark-specific harms in support of its copyright claims.

These points regarding the distinct purposes of copyright and trademark law are well-taken.  Tacticon, however, cites to no authority for the proposition it asks this Court to endorse: a plaintiff asserting copyright infringement alone cannot claim irreparable harm in the form of consumer confusion or loss of goodwill and reputation.  To the contrary, the Second Circuit has explicitly observed that, "[i]n the context of copyright infringement cases, the harm to the plaintiff's property interest has often been characterized as irreparable in light of possible market confusion." *Salinger*, 607 F.3d at 81.

Indeed, the record includes evidence of actual or likely consumer confusion in both the trademark and copyright infringement contexts.  Tacticon itself demonstrated how its use of the MultiCam Mark is likely to confuse consumers: in its attempt to demonstrate that third-party sellers use "MultiCam" as a non-infringing color option, Tacticon identified what Crye asserts are authorized MultiCam distributors.  In other words, Tacticon itself could not distinguish between MultiCam's licensees and non-licensees, suggesting at the very least that consumers are just as likely to be confused.  And as to confusion over the MultiCam design itself, Crye provides one such possible example: a buyer of one of Tacticon's products noted that it "perfectly match[ed]" the genuine MultiCam product sold by one of Crye's licensees.  *See* Antone Reply Decl. ¶ 3.

This likewise indicates consumer confusion with regards to the MultiCam design itself, even absent an accompanying trademark.

In short, Crye has sufficiently demonstrated that it is likely to suffer irreparable harm absent injunctive relief enjoining Tacticon from infringing on its MultiCam copyright and trademark rights.

## C.   The Balance of Hardships Tips in Plaintiff's Favor

In deciding a motion for preliminary injunctive relief, "a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor."  *Salinger*, 607 F.3d at 80.  This assessment requires the court to "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Yang v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020).

In a copyright infringement case, the "plaintiff's interest is, principally, a property interest in the copyrighted material," while the defendant "likewise has a property interest in [its] work *to the extent that work does not infringe the plaintiff's copyright*."  *Salinger*, 607 F.3d at 81 (emphasis added).  For this reason, "an infringer . . . cannot complain about the loss of ability to offer its infringing products."  *WPIX, Inc.*, 691 F.3d at 287.  The same logic applies in the

trademark infringement context. *See, e.g.*, *Pearson Educ*, 2019 WL 1949820, at *7.

Given the likelihood of irreparable harm discussed above, the balance of hardships tips in Crye's favor.  The inability to control its design, coupled with potential consumer confusion and loss in reputation and goodwill, threaten to cause Crye ongoing harm absent an injunction.  *See*, *e.g.*, *WPIX*, 691 F.3d at 287 ("[T]he absence of an injunction would result in the continued infringement of their property interests in the copyrighted material."); *3M Co. v. CovCare, Inc.*, 537 F. Supp. 3d 385, 404 (E.D.N.Y. 2021) (finding "substantial hardship in the form of loss of control over the quality of products bearing the 3M Marks and loss of goodwill and control over its reputation").  Tacticon's only arguments as to its harms — namely, asserted logistical difficulties attendant to complying with an injunction on an expedited timeline, *see* Def. Opp'n 23-24 — are unpersuasive.  Rather, these are the potential short-term costs that every infringing defendant faced with a preliminary injunction must bear.

Perhaps tellingly, Tacticon does not claim any more far-reaching harms — let alone "catastrophic effects" — that injunctive relief would have on its business.  *Guthrie Healthcare Sys*, 826 F.3d at 50.  As Tacticon itself indicates, its product offerings come in a variety of different colors and

patterns — ones that Crye does not argue infringe on its
MultiCam Design or the MultiCam Marks — that it may continue to
sell.  Def. Opp'n 2 (listing "Camo," "Flat Dark Earth Tan,"
"Olive Drab Green," "Ranger Green," "Black," "Black Camo," and
"Coyote Brown"); *see CJ Prod.*, 809 F. Supp. 2d at 146
("Defendants' business will not be severely impacted, as they
have an extensive array of non-infringing products that they may
continue selling.").  Similarly, there appears to be "[n]o
reason . . . why [Tacticon] cannot change its [word mark] to one
that is not confusingly similar to [Crye's] without suffering
major harm to its business."  *See Guthrie Healthcare Sys.*, 826
F.3d at 50.  In fact, Tacticon represents that it has begun to
do exactly that, making some efforts to remove "Multicam" from
its product listings.  Def. Opp'n 24.

The balance of hardships here therefore weighs in
favor of granting Crye injunctive relief.

## D.    **The Public Interest Would Not Be Disserved by an Injunction**

Finally, the Court must "ensure that the 'public
interest would not be disserved' by the issuance of a
preliminary injunction."  *Salinger*, 607 F.3d at 80.

In the copyright context, "the public has a compelling
interest in protecting copyright owners' marketable rights to
their work."  *WPIX, Inc.*, 691 F.3d at 287; *see also CJ Prod.*,
809 F. Supp. 2d at 146 ("[I]t is uncontested that there exists a

strong policy in favor of defending copyrights."). And in the trademark context, "[t]he Second Circuit has long held that there is a 'strong interest in preventing public confusion.'" *Juicy Couture*, 930 F. Supp. 2d at 505 (quoting *ProFitness Phys. Therapy Ctr. v. Pro-Fit Ortho. and Sports Phys. Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002). In other words, the public has an interest in "being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010).

An injunction preliminarily enjoining the infringement of Crye's copyrighted design and use of the MultiCam Marks in marketing products that bear the infringing design advances these policy considerations underpinning both copyright and trademark law. This public interest too, then, weighs in favor of granting an injunction.

**E.    Bond**

Under Federal Rule of Civil Procedure 65(c), "[n]o preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper." Fed. R. Civ. P. 65(c). "In fixing the amount of security required, a court is not required to order security in respect of claimed economic damages that are no more than speculative. Moreover, the burden is on the party seeking

security to establish a rational basis for the amount of the proposed bond." *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.,* 441 F.Supp.2d 552, 556 (S.D.N.Y. 2006).

Here, Tacticon has asked that a $5 million bond be imposed.  Def. Opp'n 25.  Tacticon cites cases imposing a bond in that amount, but provides no explanation as to why *it* would face that level of economic diminution in light of the injunction — indeed, Tacticon supplies no justification for that amount at all.  Given that the burden is on the party seeking a bond, no bond will be imposed at this time.  *See generally DJ Direct, Inc. v. Margaliot,* 512 F. Supp. 3d 396 (E.D.N.Y. 2021) (no bond ordered where defendant offered no support for claim that it would lose $270,000 as a result of the injunction); *New York City Triathlon, LLC*, 704 F. Supp. 2d at 345 (no bond ordered where defendant had "not demonstrated it will likely suffer any harm absent the posting of a bond, and the likelihood of success on the merits is overwhelming").  Tacticon may revisit this issue in a more fulsome submission if it chooses, at a later date.

## IV.  Conclusion

For the foregoing reasons, Crye's motion for a preliminary injunction is granted.  It is hereby ordered that:

1.   Defendant, its officers, directors, agents, servants, representatives, employees, successors, and assigns,

and all those acting in concert or in participation with it, are enjoined from:

a.   Directly or indirectly infringing the valid and duly issued MultiCam Marks;

b.   Directly or indirectly infringing the valid, registered copyright in and to the MultiCam design;

c.   Directly or indirectly manufacturing, importing, distributing, advertising, offering for sale, and/or selling counterfeits of genuine MultiCam products; and

d.   Enabling, facilitating, permitting, assisting, soliciting, encouraging or inducing others to directly or indirectly infringe the registration to the MultiCam design, along with the MultiCam Marks, to manufacture, import, distribute, advertise, offer for sale, and/or sell infringing products.

2.   Defendant, its officers, directors, agents, servants, representatives, employees, successors, and assigns, and all those acting in concern or in participation with it, must immediately locate all infringing products that are within its possession, custody or control, and immediately cease selling, distributing,

47

transferring, or disposing of those infringing

products, pending an inspection by Crye.  Any such

products determined by Crye during the inspection to

be authentic and not counterfeit shall, upon Crye's

notice of such determination, be exempted from this

Order.


SO ORDERED.

                                    /s/ Eric Komitee
                                  ERIC KOMITEE
                                  United States District Judge

Dated:    September 17, 2024
           Brooklyn, New York